IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:07CR3132 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM** |
| v. | ) | **AND ORDER** |
| | ) | |
| FABIAN PEREZ LOPEZ, | ) | |
| | ) | |
| Defendant. | ) | |

A report and recommendation concerning the defendant's motion to suppress evidence[1] (filing 22) has been issued by Magistrate Judge Piester (filing 28) and objected to by the government (filing 35). *See* NECrimR 57.3 and 28 U.S.C. § 636(b)(1). Upon de novo review, I will sustain the government's objections, not adopt the report and recommendation, and deny the defendant's motion except insofar as it pertains to statements that the defendant made to the arresting officer while in custody and prior to being read his *Miranda* rights.

### *Statement of Facts*

The evidence that the defendant seeks to suppress includes a package of heroin and other items that were seized from a vehicle that he was operating, plus statements that the defendant made in response to questioning by the arresting officer after the drug package was discovered. At an evidentiary hearing conducted by Judge Piester on December 20, 2007, testimony was presented by two Nebraska State Troopers: Ryan Henrichs, who stopped the defendant for a traffic violation and, along with other officers, performed a search of the vehicle; and David Frye, who arrived on the scene after the package was discovered, questioned the defendant, and placed him under arrest. Their testimony establishes the follows facts.

---

[1] The motion alternatively requests that the indictment be dismissed.

Shortly after noon on October 9, 2007, on Interstate 80 outside of Lincoln, near mile marker 407, Trooper Henrichs was in a cruiser speeding eastbound at 70 to 75 miles per hour in a 65 mph zone.  His attention was drawn to an Audi automobile ahead of him that abruptly decreased its speed as he approached.  Trooper Henrichs drove up next to the vehicle and slowed to match its speed, which was only about 50 miles per hour.  The Audi had Utah plates and carried only one occupant, who was later identified as the defendant, Fabian Perez Lopez ("Perez").

Trooper Henrichs' suspicions were further aroused because Perez placed his hands on the steering wheel at the 10 and 2 o'clock positions and stared straight ahead, never looking to his left at the patrol car.  After the vehicles had traveled in tandem like this for about half a mile, Trooper Henrichs saw that traffic was stacking up behind them in both lanes, so he increased his speed to make room for other vehicles to pass.  During this time Trooper Henrichs remained in the passing lane and continued to observe the Audi in his rearview mirror.

Trooper Henrichs saw that a straight truck had passed the Audi and changed lanes in front of it.  The trooper thought that the Audi, which he estimated to be 40 yards behind him, was following the truck too closely because only part of the car's front bumper was visible.  All of the vehicles were traveling about 65 miles per hour at this time.  Trooper Henrichs then slowed down to allow the truck and the Audi to catch up to him.  When he once again was even with the Audi, the trooper took out a stopwatch and timed the interval between the rear of the truck and the front of the Audi at .58 seconds.

Trooper Henrichs decided to stop the Audi to issue Perez a citation for violating the "two second" rule, so he immediately slowed the cruiser in order to get behind the Audi.  However, Perez also slowed down, staying abreast of the cruiser; the truck meanwhile continued on at its original speed, so the distance  between it and the Audi widened.  With traffic again bunching up behind the cruiser and the Audi traveling

-2-

slowly side-by-side, Trooper Henrichs decided to drive ahead and wait by the side of the road. When the Audi passed, he pulled back onto the Interstate and initiated the traffic stop at mile marker 410 or 411 (about 3 or 4 miles after the Audi was first observed).

When contacted by the trooper, Perez was unable to provide a registration certificate or current proof of insurance. Trooper Henrichs explained the reason for the stop and, in accordance with his normal procedure, asked Perez to have a seat in the patrol vehicle while he completed the paperwork for a warning citation. When Perez exited the Audi, Trooper Henrichs observed a box of latex gloves and a screwdriver on the passenger side front floorboard and a cell phone underneath the center console.

Once inside the cruiser, Trooper Henrichs reviewed identification provided by Perez and sought confirmation and additional information from dispatch. Perez said that he had been loaned the car by a friend, Juan Alvarez, but the car's paperwork identified the owner of the vehicle as Arthur Mater. Perez also said later that the car was owned by a Ramon Alvarez. Perez told Trooper Henrichs that he was traveling from Salt Lake City, Utah, to Des Moines, Iowa, to visit another friend for two days. After being asked the name of the friend he was visiting, 18 seconds of silence elapsed before Perez came up with the name of Eric Rodriguez. Perez said he had known Rodriguez for four or five years, but did not have his address; he intended to call Rodriguez when he got to Des Moines. Perez also said that he had taken the previous day (Monday) off from work in order to get ready for the trip; that he had no luggage, but planned on buying clothes when he got to Iowa; and that he had borrowed the car because he did not have enough money to fly to Iowa.

Approximately 11 minutes after being contacted by Trooper Henrichs, Perez signed the warning citation and was told that the traffic stop was ended. Perez was not told that he was free to leave, however, and Trooper Henrichs testified that he

-3-

would have detained Perez had he attempted to exit the cruiser.  Trooper Henrichs asked Perez if there was anything illegal in the Audi.  Perez denied that there was. Trooper Henrichs asked if he could search the vehicle, to which Perez responded, "Yeah, you can search."  Trooper Henrichs then retrieved a written consent to search a vehicle form and reviewed it orally with Perez.  Perez signed the written consent approximately 3 minutes after the traffic stop had ended.  Trooper Henrichs asked Perez to stay in the cruiser during the search, but told him to honk the horn if he needed to attract the trooper's attention.

Once Trooper Henrichs got out of his cruiser, he met with a second trooper who was already on the scene. They were unable to open the trunk of the Audi despite repeated attempts, so the second trooper accessed the trunk space by pulling down the back seat. A package wrapped in duct tape was found between the back seat and the trunk space.  It was removed and placed on the trunk of the Audi, in view of Perez who was still seated in the cruiser.

Trooper Frye arrived on the scene during the course of the search.  He inspected the package and found it contained axle grease, a strong odor of vinegar and what he suspected was black tar heroin.  While the second trooper left to retrieve a field drug test from a nearby weigh station, Trooper Frye contacted Perez and told him that it was a good time to start becoming truthful. He then asked Perez a number of the same questions that had earlier been asked by Trooper Henrichs, and received the same answers.  Trooper Frye talked to Perez about possible cooperation, but Perez stated that he did not know anything about the package.  At the motion hearing, the parties stipulated that this questioning by Trooper Frye took place before Perez was advised of his *Miranda* rights.

Trooper Frye returned to the Audi and was eventually able to open the trunk. The field test arrived and indicated upon usage that the substance in the package was a controlled substance (heroin). Trooper Frye returned to the cruiser and advised Perez

-4-

that he was under arrest. Trooper Frye used a card to advise Perez of his *Miranda* rights. Perez stated he understood the rights being read to him and did not appear impaired in his ability to understand. Trooper Frye then questioned Perez again, and received answers to his questions. The questioning continued while Trooper Frye drove Perez to the Lincoln traffic office. At no time did Perez invoke his right to remain silent or his right to an attorney.

### *Discussion*

Judge Piester has recommended that the motion to suppress be granted in all respects "on the basis that there was no probable cause for this traffic stop and that it was unreasonable." (Filing 34, Transcript ("Tr.") at 101:24-25.) In particular, Judge Piester found that if the Audi operated by Perez was following too closely behind the straight truck, this traffic offense "was entirely of the officer's creation and he could have avoided the creation of it" by operating his own vehicle differently. (Tr. at 100:24-25.) Judge Piester also found several inconsistencies in Trooper Henrichs' testimony, "[t]he most striking [of which] is [that] at one point he testified that he was clocking the distance between the two vehicles while he was looking at them through his rearview mirror at an angle at approximately 40 yards ahead. And then later he testified that he clocked them while he was alongside the front bumper of the defendant's vehicle." (Tr. at 101:2-7.)

Judge Piester made two additional findings on the record: (1) that Perez was interrogated by Trooper Frye while he was in custody and before being *Mirandized*, and (2) that Perez did not unambiguously waive his *Miranda* rights after they were read to him by Trooper Frye. Based on these findings, Judge Piester concluded that statements made by the defendant should be suppressed regardless of the validity of the traffic stop, but also indicated that he was "not going to make the recommendation on the statements at this time[;] I'll make it only on the probable cause because that's what I think is the pivotal issue" (Tr. at 103:7-9.)

Judge Piester concluded: "In any event, I have no doubt that [Trooper Henrichs] believed that there was .58 seconds between the vehicles, but I don't think ... that that belief was reasonable under all of the facts and circumstances that I've heard described in the testimony today. So I will recommend that the motion to [sic] granted on the basis that there was no probable cause to stop the vehicle in the first place." (Tr. at 101:9-16.) Respectfully, I disagree with this conclusion.

While there is no question that Trooper Henrichs was looking for a reason to stop the Audi, an officer's subjective motivations in initiating a traffic stop play no role in analyzing the constitutional reasonableness of the stop under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 813 (1996). A traffic stop is reasonable under the Fourth Amendment "if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Washington*, 455 F.3d 824, 826 (8th Cir.2006).

The constitutionality of the traffic stop in this case depends upon whether Trooper Henrichs's expressed belief that Perez had violated a traffic law, by following the straight truck too closely, was objectively reasonable. I find that it was.

In Nebraska, it is unlawful for the driver of a motor vehicle to "follow another vehicle more closely than is reasonable and prudent." Neb.Rev.Stat. § 60-6,140(1) (West, WESTLAW through 2007 Sess.). "While the so-called 'two-second rule' is not enshrined in Nebraska law, it is a widely-used rule of thumb that accounts for the speed of traffic in a more reliable way than does a distance-based heuristic." *United States v. Andrews*, 454 F.3d 919, 921-22 (8th Cir. 2006). Thus, "when one car trails another by less than two seconds, an officer will generally have probable cause to believe that the trailing car is closer than what is reasonable and prudent." *Id.* at 922.

The evidence in this case shows that only .58 seconds separated the Audi from the straight truck when both vehicles were traveling at about 65 miles per hour. The

truck actually may have created the situation when it changed lanes in front of the Audi, but the evidence is not entirely clear on this point.

On direct examination by the prosecuting attorney, Trooper Henrichs provided only a vague description of what he saw in his rearview mirror:

> Q. As you sped up and you - did you go ahead of the white Audi?
> A. Yes.
> Q. What happened that you noted?
> A. When I sped up, there was a straight truck that was behind me that went past the white Audi and then changed lanes into the driving lane. And at that point I noticed that the white Audi was following that straight truck too closely.
> Q. How were you able to tell that?
> A. Well, I seen the vehicle and thought that the white Audi was too close. I then slowed down so that the vehicles were right beside me and I obtained a stopwatch clock on the rear bumper of the straight truck on a certain point on the road to the same point of the road on the front bumper of the white Audi.

(Tr. at 10:19-11:8.)

On cross-examination, however, Trooper Henrichs estimated that he was 40 yards ahead of the Audi when he saw the straight truck change lanes in front of it:

> Q. Okay. And you saw this straight - when you looked through your rearview mirror, was the straight truck the first vehicle behind you?
> A. I don't believe so.
> Q. So when you created room, you eventually saw this straight truck pass the Audi, still in your lane of traffic.
> A. Correct.
> Q. Then the straight truck came over to - if you're in the Audi, came from the left-hand lane to the driving lane which is the right lane.
> A. That's correct.
> Q. In front of the Audi.
> A. Correct.

Q. And now at this time, you're trying to stay somewhat close to the Audi so you can still make contact in your rearview mirror.

A. I want to keep it in view, correct.

Q. So you're not zooming a mile or so ahead.

A. No.

Q. How far are you away from the Audi?

A. I would guess 40 yards.

Q. And are you still traveling - had you settled back down to 50 miles an hour in the passing lane?

A. No. We have sped up at this point.

Q. When you say "we," who's "we"?

A. Myself and the white Audi sped up. We were no longer traveling at 50 miles an hour. Once I pulled forward, he kind of pulled forward and increased speed.

Q. But as he's pulling forward and you're pulling forward, you're pulling forward at a rapider rate to allow traffic to pass the white Audi.

A. That's correct.

Q. And indeed a straight truck did pass the white Audi.

A. That's correct.

Q. And that straight truck cut off the Audi.

A. I did not see that, no.

Q. And then you slowed down in order to calculate the gap between the two vehicles.

A. Yes. I was driving in the passing lane. The white Audi appeared to be following the straight truck too close so I slowed down to accurately get a clock.

Q. And since you're only 40 yards ahead, it didn't take you very long to slow down to get an accurate clock.

A. Not that long, no.

(Tr. at 45:21-47:14.)  Although Trooper Henrichs testified that he did not see the straight truck cut off the Audi, his estimate that there was only 40 yards (120 feet) of space between the cruiser in the passing lane and the Audi in the driving lane would suggest that the straight truck made a dangerous passing maneuver.  Even if the vehicles were still traveling at 50 miles per hour (which is contrary to the trooper's testimony), the 2-second rule would require the truck to stay 147 feet behind the

cruiser in the passing lane – that is, 9 yards further back than the Audi.  At 65 miles per hour, the 2-second distance is 191 feet.  If the 40-yard estimate is accurate, the straight truck could not pass the Audi, let alone change lanes in front of it, without being driven in an unsafe manner.

The foregoing also assumes that the 40-yard estimate pertained to the time when the straight truck pulled in front of the Audi, and not when Trooper Henrichs observed that the Audi was following too closely and he decided to slow down in order to take a stopwatch reading.  When Judge Piester asked about the straight truck passing the Audi, Trooper Henrichs indicated that other vehicles had also passed the Audi.  More importantly, Trooper Henrichs testified that he did not know how long the straight truck had been in the driving lane before he noticed that the Audi "pulled up behind" it and was following too closely:

> Q. How did that straight truck pass it if you were in the passing lane?
> A. I - we're traveling at 50 miles an hour, and traffic's backing up behind us. After like a half mile, I pulled up and left the white Audi behind. I increased my distance from the white Audi. At that time, vehicles passed and that's when the straight truck passed and got in front of the white Audi. I then noticed that the truck - or the white Audi pulled up behind the straight truck and was following it too closely.

(Tr. at 57:2-10.)

> Q. When did you slow down to go back even with the Audi again?
> A. After the straight truck gets into the driving lane and drives, I don't know how long. I mean, I don't even have a guess on how long he was in the driving lane. I'm up in front of it and notice - or I believe it's following too close and that's when I fall back. And that's when I - the time period it took me to fall back to clock it, that's what I'm guessing is approximately 30 seconds.
> Q. Okay.
> A. How long the straight truck was in the driving lane before I noticed the following too close, I don't know.

(Tr. at 58:15-59:1.)  Unfortunately, when Judge Piester specifically asked about the 40-yard estimate, Trooper Henrichs gave only a general response:

> Q. And, let's see, you said at some point you estimated your speed - or your distance in front of the Audi at 40 yards ahead of it. And at what point was that?
> A. That's when I went ahead to let vehicles get by.
> Q. Okay. So you weren't directly ahead of it. You were in the other lane.
> A. Correct. That's correct. I was in the passing line. The white Audi was in the driving lane.

(Tr. at 61:7-14.)

In follow-up questioning by the prosecuting attorney, Trooper Henrichs claimed that he had driven far enough ahead in the passing lane for other vehicles to get past the Audi, and he reiterated that "the Audi got in behind" the straight truck after the truck changed lanes:

> Q. You travel forward in the passenger lane - I mean, the passing lane.
> A. Correct.
> Q. The defendant stays in the driving lane.
> A. Correct.
> Q. You go to you said approximately 65 miles an hour.
> A. That's a guess. I sped up, yes.
> Q. Okay. To give cars behind you an opportunity to start moving.
> A. Correct.
> Q. Would that include passing the vehicle - the white Audi if necessary?
> A. Yes.
> Q. And you left enough space for that to happen.
> A. Yes, I did.
> Q. But not so far that you could not still maintain some eye contact on the Audi.
> A. Correct.
> Q. And as you're pulling forward in the passing lane, you do observe a straight truck. Is it - was the straight truck - I'm confused. Was the straight truck right behind you or did you say that the straight truck came from behind the Audi?

A. No, there was a straight truck in my lane. I don't think it was - I'm really sure that it wasn't the vehicle right behind me, but it was in my lane. It was in the passing lane.

Q. Okay. So you go forward pulling away from the Audi. The straight truck - you think there was another vehicle between you two.

A. At least one.

Q. Okay. You noticed the truck because it's bigger in profile?

A. No. I mean, I didn't even really pay particular attention to the truck until the truck got into the driving lane and the Audi got in behind it. That's when I --

Q. So you pull forward. Cargo's vehicle, whatever, the truck is behind you in the passing lane, and then the white truck pulls into the driving lane?

A. A straight truck. I don't know what color it was, but yes, it pulls from the --

Q. I don't know why I keep saying white. I'm sorry. The straight truck keeps --

A. Yes.

Q. -- pulls into the --

A. The straight truck pulls from the passing lane into the driving lane.

Q. Okay. And that is in front of the Audi.

A. Correct.

Q. But you're still able, then, to maintain visual contact with the Audi.

A. Correct.

Q. Driving about the speed limit.

A. Correct.

Q. The straight truck appears to be driving about the speed limit.

A. Correct.

Q. And from what you can see at this point now, the white Audi who's following the straight truck is driving about the speed limit.

A. Correct.

(Tr. at 64:10-66:18.)


On further cross-examination by defense counsel, Trooper Henrichs either agreed that he was 40 yards ahead of the Audi when it was being passed by other vehicles, or else that he was 40 yards from the Audi when he decided to slow down

-11-

in order to let the Audi catch up to him.  Perhaps he was agreeing to both.  From the form of the questioning, it is impossible to tell:

> Q. Trooper Henrichs, I'm going to ask you questions at while you're traveling 50 miles an hour abreast of the Audi --
> A. Okay.
> Q. -- you make the decision to pull ahead to let traffic go by --
> A. Yes.
> Q. -- because there is traffic backed up behind you.
> A. That's correct.
> Q. There's at least one, if not more, vehicles in your lane of traffic until you get to the straight truck.
> A. That's correct.
> Q. Were there other vehicles behind the straight truck?
> A. I believe there was, yes.
> Q. Were there vehicles in the driver's lane behind the Audi?
> A. Yes, there was.
> Q. How many?
> A. I'd have to guess. Maybe five, eight, ten. I don't know for sure.
> Q. And when you made the decision to close that - you pulled ahead and traffic starting to pass between your two vehicles --
> A. Correct.
> Q. -- you say you're 40 yards ahead.
> A. Approximately.
> Q. And you make the decision to slow down and close the gap back to be abreast of the Audi.
> A. Yes.

(Tr. at 68-69:16.)

Although Judge Piester concluded that Trooper Henrichs caused the traffic violation to occur by moving only 40 yards ahead of the Audi while continuing to occupy the passing lane, it is not clear from Trooper Henrichs' testimony that this, in fact, was the situation.  His testimony can also be understood as saying that the Audi speeded up to "pull up behind" or "get in behind" the straight truck after being passed by it, which thereby shortened the distance down to 40 yards.  Trooper Henrichs

-12-

denied seeing the truck cut off the Audi and stated that there was enough space for vehicles to pass the Audi.  Even assuming that the Audi was only 40 yards behind the cruiser when it was passed by the straight truck, there is no evidence that Trooper Henrichs intended for this to happen.  He did not, for example, slow back down to 50 miles per hour after making space for other vehicles to pass.[2]  Trooper Henrichs testified that "[o]nce he pulled forward, [the Audi] kind of pulled forward and increased speed" until both vehicles were traveling at about 65 miles per hour, which was the posted speed limit.  (Tr. at 46:22-23.).  Even though the traffic violation might not have occurred if Trooper Henrichs had moved into the right-hand driving lane after passing the Audi, his actions in staying in the passing lane while traveling at the speed limit did not cause the traffic violation.[3]

---

[2] Judge Piester apparently thought that such a trap had been set, but Trooper Henrichs informed the court that the facts were otherwise:

> Q (by the court). So you're - you are then forcing people, if they're going to pass you going also 50 miles an hour at this point, to go on the right.
> A. No. We are not at 50 miles an hour at this point.
> Q. How fast are you going at that point?
> A. I would say we're doing approximately the speed limit.

(Tr. at 59:14-19.)  The true set of facts was confirmed on further redirect by the prosecuting attorney, as previously set forth.

[3] Judge Piester thought it was unreasonable for Trooper Henrichs to stay in the passing lane.  He stated:

> The testimony of the officer was not clear, but one of the things that was consistent and was clear was that after he passed the defendant's vehicle, he stayed in the left lane, thereby controlling how much space there was available for the straight truck to pass the defendant's vehicle.  The trooper could have pulled well ahead.  Did not.  The trooper could have pulled over to the right lane allowing the truck to pass both the vehicles.  He didn't do that, either.  He didn't have a reason for that because he admitted that he wanted to see the defendant's vehicle and he could have

-13-

In any event, once Trooper Henrichs made the observation that the Audi was following the straight truck too closely, he slowed down in order to get a confirming stopwatch reading.  He thought it took about 30 seconds for the two vehicles to catch up to him, during which time the distance between the straight truck and the Audi stayed the same.  Only after he once again drew even with the Audi did Trooper Henrichs use the stopwatch to determine that it was traveling .58 seconds behind the straight truck.  Perez therefore had an opportunity to slow down himself so as to increase his following distance, but he did not do so.  After obtaining the stopwatch reading under these circumstances, Trooper Henrichs had probable cause to initiate the traffic stop.

Judge Piester also found that Trooper Henrichs' testimony was not entirely credible because it contained numerous inconsistencies.  After carefully reviewing the hearing transcript (which, of course, was not available to Judge Piester at the time he made this finding), I do not find Trooper Henrichs' testimony to be inconsistent.  It is sometimes confusing, and oftentimes unclear, but in large part this is a product of the questions that were asked (and not asked) by both sides.  Judge Piester was particularly concerned that Trooper Henrichs gave inconsistent testimony regarding his use of the stopwatch, but I find that his testimony was completely consistent on this point – Trooper Henrichs never testified that he took a stopwatch reading while looking in his rearview mirror.  Rather, he always stated that he used the stopwatch after the Audi had caught up to him:

> Q (by prosecuting attorney). How were you able to tell that [the Audi was following the straight truck too closely]?
> A. Well, I seen the vehicle and thought that the white Audi was too close.  I then slowed down so that the vehicles were right beside me and

---

a better view of it through his rearview mirror when he was directly in front of it rather than at an angle.

(Tr. at 100: 5-16.)

-14-

I obtained a stopwatch clock on the rear bumper of the straight truck on a certain point on the road to the same point of the road on the front bumper of the white Audi.

* * *

Q (by prosecuting attorney). Did you do this just one time or did you do it several times?  Do you recall?

A. I don't know in this case.  Usually, I do it several times.  Usually, I do about three clocks. I remember one for sure in this case.

Q. During the time that you were performing the clock and you were watching the white Audi and the follow distance of the vehicle in front of it, did that distance change or did it remain fairly the same?

A. While I was clocking it?

Q. Yes.

A. I know the time that I was beside the straight truck and the white Audi clocking it that it stayed the same.

(Tr. at 11:2-8; 13:13-25.)

Q (by the court). And I take it as you were clocking the Audi on the following distance, you were looking in your mirrors to do that. Is that right?  Because it was behind you?

A. No.

Q. Okay. Tell me how that happened.

A. I was in front of it when I thought the vehicle was following too closely. I then slowed down so that they were beside me and that's when I clocked it.

Q. I thought you clocked it on the straight truck that passed it.  Is that right or is that wrong?

A. No, that is correct, yes.[4]

(Tr. at 56:16-57:1.)

---

[4] Perhaps it was Trooper Henrichs' response to the final question that caused Judge Piester to erroneously conclude that the trooper testified he was operating the stopwatch when the truck passed the Audi.

-15-

Q (by prosecuting attorney). And when you're answering the judge's question, my understanding from that was that the clock that occurred when you again went back and were truck - immediately behind the truck is the white Audi. You are immediately parallel with it. Is that right?

A. Yeah, I slowed down to get to that point, yes.

* * *

Q. And at the time you performed the clock, were you pretty much steering wheel to steering wheel even with the Audi? Do you know what I'm saying?

A. I believe I was straight across from its front bumper.

(Tr. at 66:25-67:5; 67:11-14.)

The government does not object to Judge Piester's finding that Trooper Frye interrogated Perez before reading him his *Miranda* rights and while he was in custody. Even though Judge Piester did not make a recommendation based on this finding, any statements Perez made to Trooper Frye before being *Mirandized* will be suppressed.[5] *See United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007) (a *Miranda* warning must be administered when a suspect undergoes custodial interrogation, which occurs when an officer's interaction with the suspect is "likely to elicit an incriminating response.") (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

The government does object, however, to Judge Piester's finding that Perez did not "unambiguously waive" his *Miranda* rights, for the reason that such finding was based on a misapprehension of the law, and is therefore immaterial. This objection will be sustained. "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure

---

[5] The government contends that the same information was elicited by Trooper Henrichs during his earlier, pre-custody questioning of the defendant. Any statements Perez made to Trooper Henrichs are not subject to the suppression motion.

a conviction, the analysis is complete and the waiver is valid as a matter of law." *Moran v. Burbine*, 475 U.S. 412, 422-23 (1986). "A suspect invokes his right to remain silent by making a clear, consistent expression of a desire to remain silent. Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda*. Being evasive and reluctant to talk is different from invoking one's right to remain silent." *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) (internal quotations and citations omitted).

On the evidence presented, I find that Perez made a voluntary, knowing, and intelligent waiver of his *Miranda* rights after being placed under arrest. Statements that he made after being *Mirandized* by Trooper Frye will not be suppressed.

IT IS ORDERED that:

1.    The government's objections (filing 35) to the magistrate judge's report and recommendation are sustained.

2.    The report and recommendation (filing 28) is not adopted.

3.    The defendant's motion to suppress evidence, or, alternatively, to dismiss the indictment (filing 22), is granted in part and denied in part, as follows:
   a.    Any statements made by the defendant in response to questioning by Trooper David Frye, prior to the defendant being advised of his *Miranda* rights, shall not be admissible in evidence.
   b.    In all other respects, the motion is denied.

January 29, 2008.                    BY THE COURT:
                                     s/ *Richard G. Kopf*
                                     United States District Judge

-17-